# EXHIBIT A

I, John Lee Bishop, swear under penalty of perjury that the following is true and correct.

I am 57 years old. I have been incarcerated since September 2018, and have served a total of 21 months, on a 60-month sentence that was because of a mandatory minimum. Originally, I signed a plea agreement for 18-24 months.

I fell and was unconscious in July 2019. There were several witnesses. Doctor Oba sent me for an MRI, which was performed on September 5th, 2019 at OPEN MRI in Pueblo, Colorado. Subsequent to that first MRI, I was diagnosed with a brain tumor on October 5th, 2019 and was told by NP Ms. Fabroni (BOP).

The initial MRI was verified by a second MRI on December 8th at Saint Thomas Moore Hospital in Canon City, Colorado. This MRI was done with contrast, and the original MRI was verified to be a Macroadenoma. The tumor is on my pituitary gland that is causing other issues.

I was diagnosed with HYPOTHYROIDISM in January 2020 by Doctor Sterett, MD (BOP). Because of my thyroid not working, I have unexplained weight gain, and also no energy.

There have been no subsequent lab tests as of this affidavit to determine the growth or rate of growth. I met with a Neurosurgeon at Memorial Hospital in Colorado Springs in February 2020. The neurosurgeon explained to me that I will more than likely have surgery to remove the tumor in November 2020 sometime.

In addition to these tests, I have an endocrinology appointment, a CT scan, and also an appointment with ENT. These are pre-surgery appointments and were scheduled to happen soon, but now with the COVID-19 I was told by the BOP that all of these appointments and surgery will be pushed out past the end of 2020.

In the meantime, I am suffering in a facility that is Chronic Care 2 facility. I am in my bunk more than 75 percent of the time. I suffer with severe headaches, dizziness, field of vision problems and also suffer with tinnitus. I rarely am able to go to the chow hall or walk around the compound.

I am currently housed at FCI Florence prison camp in Florence Colorado. The housing facility (unit) in which I currently reside consists of 240 beds in the whole facility. I am in a dorm style housing unit with short walls and there are 30 men in 15 cubicles/cells that are 9 feet by 7 feet. I am in close quarters with other individuals (approx 200) 24 hours a day, and all hours of the day am unable to abide by the CDC's recommended social distancing standards.

Besides having a brain tumor, I take two separate prescribed medications for hypertension. I have also been diagnosed with hypothyroidism, which has caused me to become extremely overweight. I have severe arthritis and am in need (and it is verified and approved by the BOP) of a hip replacement. Prior to being in prison I had bilateral knee replacements. I take medication for this as well. I also have sleep apnea and have been waiting more than a year to get a CPAP machine. I wake up multiple times every night when I stop breathing. I also suffer from

DECLARATION OF JOHN LEE BISHOP – PAGE 1

allergies, but do not have any medications for this.  I also have had pnemonia in both 2018 and 2019.

In addition, there is no social distancing in the prison I am housed in. With 200 men, in dorm style living, there is NEVER a time when we are able to socially distance ourselves from each other. Everyone is housed in 2 men cells, which are like cubicles. In each cell there are only 2 lockers and 2 bunks. The square footage is approximately 9 x 7. We have common bathroom and shower areas that are for 30 inmates that live in one "range" or section of the building.  The walls are only 6 feet, which allows airflow from everyone to everyone in the range. We are locked down, but not from the other 200 inmates. There are 4 TV rooms, separated by race (white, black, Mexican, Texas). When meals are served, they are brought to the unit, and there are up to 6 Correctional Officers, all standing within 4 feet of each other and the inmates as we line up (not more than 1-2 feet apart) and wait to get our meal. The Correctional Officers most of the time do not have personal protection equipment. There is a level of stress I have never seen before in prison.  I fear for my life, as do other men, who like me have underlying medical conditions.

I believe because of the length of time I have served (21 months), and because I am a minimum risk inmate with no history of violence, and with custody points of 0, I am a perfect candidate for release to home confinement and hope I can get compassionate release.

Additional details of my symptoms and medications are included below.

SYMPTOMS

1. Currently I am spending 15-18 hours in my bunk. When I arrived 14 months ago, I was walking the track, active, exercising, attending and teaching BOP classes for inmates and leading several Bible studies. I have progressively been more tired as the months have gone on, lacking energy for even basic self-care.

2. Most of the days I have had (for months) splitting headaches, unable to respond to even letters that have been sent to me. I don't go to mail call or the chow hall and haven't for months.

3. My vision has been worsening. Specifically, 2 months ago, I saw a burst of light and then it was like looking through broken glass (windshield or glasses) and I can see these 'cracks' in my left eye. I have gone to the medical staff here, but no answers. I have experienced dizziness and loss of balance. When I sit up to go to the bathroom at night, I have to sit for sometimes 1-2 minutes to clear my head. It feels like motion sickness, possibly vertigo is exacerbating the symptoms.

5. I am at a Chronic Care level 2 facility, and am probably the most at-risk inmate in this place, especially with the corona virus attacking immune systems that are compromised like mine.

6. I have progressive degenerative arthritis. Different X-Rays have been done and because of bi-lateral knee replacements less than 5 years ago, my right hip and both hands leave me in excruciating pain.

7. Issues with my short-term memory has also progressively gotten worse.

In summation, it has been 9 months since I first fell, and 8 months since the BOP knew I had a brain tumor. I have met one time with a neurosurgeon, who told me in no uncertain terms that the tumor needs to be removed. Although approved for appointments with endocrinology, radiology, neurology, and ENT specialist, all of these appointments are pushed out indefinitely (according to the BOP), leaving me in a place of suffering and a tumor that continues to grow and continues to jeopardize my long-term vision and health.

MEDICATIONS CURRENTLY PRESCRIBED:
1. LOSARTAN 50 mg a day (hypertension)
2. AMLODIPINE 10 mg a day (hypertension)
3. NAPROXEN 500 mg 2 x daily (arthritis/pain)
4. SERTRALINE HCI 50 mg a day (depression)
5. ACETAMINOPHEN 325 mg 3 x daily (pain)
6. LEVOTHYROXINE 50 mg a day (Hypothyroidism)
7. MELOXICAM 15 mg a day (Arthritis/pain)
8. ASPIRIN 81 mg a day (baby aspirin for hypertension)

BOP blood tests show I am borderline diabetic, but currently take no medication for this.

My doctor here at camp is Dr. Justin Sterett, MD.

Signed _John Lee Bishop_       Date _4/17/2020_
JOHN LEE BISHOP
POA - Michelle A. Bishop

DECLARATION OF JOHN LEE BISHOP – PAGE 3

Durable Power of Attorney

## DURABLE POWER OF ATTORNEY

I, JOHN BISHOP, the undersigned principal, domiciled and residing in the State of Arizona, hereby revokes any other general durable power of attorney which the principal. May have previously executed, and as authorized by Arizona Law, as amended, designates and appoints MICHELLE BISHOP as attorney-in-fact, should the principal hereafter become disabled, incapacitated, or incompetent.

1. **Powers:** The attorney-in-fact, as a fiduciary, shall have all powers of an absolute owner over the assets and liabilities of the principal, whether located within or without the State of Arizona, including (but not limited in any way by the following specific grants) the power and authority to:

    a. Withdraw any or all funds from and deposit funds in any savings or checking account in the principal's name alone or in joint names, and to endorse checks for deposit in any account in the principal's name or in joint names.

    b. Enter any safe deposit box to which the principal has a right of access and deposit or remove property there from.

    c. Sell, exchange, or otherwise transfer title to the principals stocks, bonds or other securities. With respect to any account with any brokerage firm (i) to buy, sell (including short sales), trade in, receive, and deliver securities or commodities and/or contracts for commodities or securities, and to order their receipt from and delivery to others, in accordance with such firm's terms and conditions;(ii) to receive and make payments for the principal's account and to order payments to, and the receipt of payments from, others for the principal's account, and (iii) to receive, approve, and confirm any and all notices and demands of every nature intended for the principal. The principal hereby consents to the supervision by such firm of any or all transactions with respect to the principal's account, but neither this consent nor any act of supervision by such firm shall obligate it to, or imply that it should supervise each and every transaction.

    d. Transfer, sell, purchase, lease, convey, exchange, assign or otherwise transfer or encumber, or exercise any option, election, privilege, or power with respect to any or all of the principal's property, real and person, tangible and intangible, within or without the State of Arizona (including specifically the principal's homestead interest in any real property), as the principal's attorney-in-fact deems appropriate.

    e. Disclaim, in whole or in part, any interest in property, whether outright, in trust, or otherwise, so long as in the sole discretion of the attorney-in-fact, such disclaimer would not be detrimental to the best interests of the

Page 1 of 5

Durable Power of Attorney

principal, and would be in the best interests of those interested in the estate of the principal and of those who take as a result of such disclaimer.

f.  Submit all federal and state income tax and gift tax returns on behalf of the principal and to pay all such taxes as may be due; to represent the principal during audits, appeals and lawsuits related to any income or gift tax return filed on behalf o the principal, and to pay any assessments for interest or penalties levied against the principal in connection with such tax returns; and to complete and execute Internal Revenue service Forms granting authority to act for the principal and to act as attorney-in-fact there under, with respect to any tax year and tax liability of the principal.

g.  Make transfers of the principal's property, both real and personal, to any trust created by the principal of which the principal is the beneficiary during the principal's life.

h.  Make transfers of the principal's property, including but not limited to transfers to the principal's spouse and gifts to the principal's children, for the purpose of qualifying the principal for governmental medical assistance to the full extent provided by law should there be a need for medical care for the purpose of preserving for the principal's spouse the maximum amount of property allowed under applicable law if an application has been made for government medical assistance; any transfers made pursuant to this paragraph shall not be deemed a breach of fiduciary duty by the attorney-in-fact. .

i.  Make gifts, whether outright or in trusts, to charities and to the relatives of the principal and the spouses of any such relatives, in accordance with any pattern of making such gifts to such person which the principal has established or planned to establish or in such amounts as the attorney-in-fact shall determine appropriate so long as such gifts would be in the best interests of the principal and those interested in the estate of the principal, such determination to be made in the sole discretion of the attorney-in-fact; provided, however the attorney-in-fact, may make gifts to himself or herself from the principal's property in accordance with any pattern o making gifts which the principal may have established or planned to establish, but shall make other gifts to himself or herself only to the extent such gifts are advisable for the attorney-in-fact's health, support, maintenance and education. Notwithstanding any other provision of this power of attorney or of applicable law to the contrary, the attorney-in-fact shall not have any right or power exercisable by the attorney-in-fact which would otherwise constitute a general power of appointment in the attorney-in-fact under Sections 2041 or 2514 of the Internal Revenue Code of 1986 as amended.

Page 2 of 5

Durable Power of Attorney

2. **Purposes:** The attorney-in-fact shall have all powers as are necessary or desirable to provide for the support, maintenance, health, emergencies and urgent necessities of the disabled or incompetent principal.

3. **Effectiveness:** This power of attorney shall become effective signing.

4. **Duration:** This durable power of attorney becomes effective as provided in section 3 hereof, and shall remain in effect for the period and to the extent permitted by Chapter 11.94 of the Revised Code of Arizona, as amended, or until revoked or terminated under Section 6 or 7 thereof, notwithstanding any uncertainty as to whether the principal is dead or alive.

5. **Limitation upon Authority:** Except as otherwise expressly provided herein, the only limitation upon the power and authority granted herein to the principal's attorney-in-fact, shall now have the power to amend or revoke any Will, Codicil, trust or other testamentary document the principal has executed or shall execute; provided, however, that if it should be determined by the principal's attorney-in-fact, in consultation with and with the concurrence of the principal's then acting lawyer, that the existence of (i) any account or document (including any of the principal's life insurance beneficiary designations and retirement plan beneficiary designations) passing property outside of probate or (ii) any property held as joint tenants with right of survivorship is inconsistent with the principal's overall estate plan, the principal's attorney-in-fact shall have the power to take whatever action is necessary, or to join with the other joint tenant(s) in such action, to ensure that any such property, the funds in any such account, or any property subject to any such document passes in a manner consistent with the principal's overall estate plan.

In addition, with respect to any life insurance policies insuring the life of the attorney-in-fact and owned by the principal, this power of attorney shall not authorize or empower the attorney in fact to exercise any incidents of ownership over same.

6. **Revocation:** This power of attorney may be revoked, suspended, or terminated in writing by the principal with written notice to the designated attorney-in-fact. In addition, if this power of attorney has been recorded, the written instrument of revocation shall be recorded in the office of the recorder or auditor of any county in which the power of attorney is recorded.

7. **Termination:**
   a. By appointment of Guardian: The appointment of a guardian of the estate of the principal vests in the guardian, with court approval, the power to revoke, suspend or terminate this power of attorney. The appointment of a

Page 3 of 5

Durable Power of Attorney

guardian of the person only does not empower the guardian to revoke, suspend or terminate this power of attorney.

   b. By death of Principal: The death of the principal shall be deemed to revoke this power of attorney at the time the attorney-in-fact receives actual knowledge or actual notice of such death.

8. **Nomination of Guardian:** While the principal hopes that the execution of this document will have obviated the need for a guardianship not only of the principal's estate but also of the principal's person, if it should become necessary to appoint a guardian or limited guardian of the person or estate of the principal, the principal hereby nominates the then acting attorney-in-fact designated above as the principal's said guardian or limited guardian.

9. **Accounting:** The attorney-in-fact shall be required to account to any personal representative subsequently appointed for the principal.

10. **Reliance:** the designated attorney-in-fact and all persons dealing with the attorney-in-fact shall be entitled to rely upon this power of attorney so long as the time of any act taken pursuant to this power of attorney, the attorney-in-fact had not received actual knowledge of actual notice of any revocation, suspension, or termination of the power of attorney by death or otherwise. Any action so taken, unless otherwise invalid or unenforceable, shall be binding on the heirs, devisees, legatees or personal representatives of the principal.

11. **Liability of attorney-in-fact:** The estate of the principal shall hold harmless and indemnify the attorney-in-fact from any and all liability for acts done in good faith and not in fraud on behalf of the principal.

12. **Property:** This power of attorney shall apply to all of the principal's interest in community property and to the principal's separate property, whether now owned or hereafter acquired.

13. **Applicable law:** The laws of the State of Arizona shall govern this power of attorney.

///

///

Page 4 of 5

Durable Power of Attorney

In Witness thereof, the undersigned has executed this instrument as of the _3rd_ day of ___July___ 2018.

Name ___JOHN LEE BISHOP___

**STATE OF ARIZONA** )
**COUNTY OF YUMA** )

    This is to certify that on this ___3rd___ day of ___July___, 2018, Before me, the undersigned Notary Public, personally appeared ___JOHN LEE BISHOP___, to me known as the individual described in and who executed the foregoing Durable Power of Attorney, and acknowledged to me that he or she signed the same as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this ___3rd___ day of ___JULY___, 2018

_____
Notary signature

___ANTHONY CUELLAR___
Notary name printed

Notary Public in and for the State of Arizona
Residing at ___Yuma, Az___
My commission expires: ___JUNE 17, 2019___

ANTHONY CUELLAR
Notary Public - Arizona
Yuma County
My Commission Expires
June 17, 2019

Page 5 of 5

# EXHIBIT B

John Bishop
Reg. No. 65782-298
Federal Prison Camp
P.O. Box 5000
Florence, CO  81226

December 8, 2019

Warden E. Williams
Federal Prison Camp
5880 State Highway 67 South
Florence, CO  81226

Re:  Request for Compassionate Release/Reduction in Sentence

Dear Warden Williams:

Please accept this letter as my request for a Compassionate Release/Reduction in Sentence as provided by 18 U.S.C. § 3582(c)(1)(A). I am making this request as I have recently been diagnosed with a brain tumor on my pitutiary gland.  This tumor meets the United States Sentencing Commission definition of a "serious and advanced illness with an end of life trajectory".  (U.S.S.G. § 1B1.13).  I therefore have "extraordinary and compelling reasons" for making this request.  In addition to having an end of life trajectory, this condition along with my other medical issues, affect my ability to function in this environment.

In support of my request, I am providing the following information as required by Bureau of Prisons Program Statement 5050.50, Compassionate Release/Reduction in Sentence:

Nature and Circumstance of My Offense: After losing my job of over 20 years, I began using alcohol.  My use turned into an addiction, and to support myself and my addiction, I agreed to assist in the distribution of marijuana.

Criminal History: Prior to my arrest on this offense, I had no prior criminal history.

Comments from Victims:  I do not believe that there were any identifiable victims to my offense.

Unresolved Detainers: I do not have any unresolved detainers.

Supervised Release Violations: I have no supervised release violations or any pre-trial release violations.

Institutional Adjustment: The brain tumor has severely affected

Warden E. Williams
December 8, 2019
Page 2

my institutional adjustment as well as my ability to function in this environment. I now have a near constant headache, short-term memory loss, and a feeling of nauseousness.

Because the tumor is putting pressure on my optic nerves, my vision has become blurred. As a result of these conditions, I have fallen on the compound or in my unit on several occassions, losing consciousness twice. According to the medical staff, my recent MRI indicates that I have also suffered several "mini-strokes".

While unrelated to the tumor, I also have severe arthritis in both of my hips and in both of my hands. The arthritis in my hips makes it painful to stand for counts, and difficult, and at times impossible, to walk to the chow hall or medical.

Disciplinary Infractions: None.

Personal History Derived from the PSR: I do not have access to my PSR, but I believe the following information either was, or should have been included:

I was born on February 15, 1963, so I am now 56 years old.

I am a veteran of the United States Air Force. I served four years on active duty, and three years in the Air Force Reserves. Upon leaving the Air Force, I received an honorable discharge.

My principle occupation was as a pastor of a non-denominational church that I founded in Vancouver, Washington.

I have been married for 36 years, and I have three adult children.

In 2015, I had a relationship with a woman who was not my wife. As a result of this relationship, I was terminated from my position as the lead pastor of the church I had founded. It was after this event that I began using and abusing alcohol.

Length of Sentence and Amount of Time Served: I am serving a mandatory minimum sentence of 60 months. I began serving this sentence in September, 2018, and I have now completed approximately 25% of my period of incarceration.

Inmate's Current Age: As stated above, I am now 56 years old.

```
                    YUMA
              2222 S 4TH AVE
           YUMA, AZ 85364-9998
               039842-0900
              (800)275-8777
            12/21/2019 11:02 AM
```

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| PM 2-Day Med FR Box | 1 | $14.35 | $14.35 |

```
        (Domestic)
        (VANCOUVER, WA  98686)
        (Flat Rate)
        (Expected Delivery Day)
        (Tuesday 12/24/2019)
        (USPS Tracking #)
        (9505 5114 5972 9355 2926 37)
Insurance                               $0.00
        (Up to $50.00 included)
First-Class Mail@    1     $0.55        $0.55
Letter
        (Domestic)
        (FLORENCE, CO  81226)
        (Weight:0 Lb 0.60 Oz)
        (Estimated Delivery Date)
        (Tuesday 12/24/2019)
Certified                               $3.50
        (USPS Certified Mail #)
        (70191640000191585092)
```

| Total: | $18.40 |
|---|---|

| Cash | $20.00 |
|---|---|
| Change | ($1.60) |

Includes up to $50 insurance

Text your tracking number to 28777
(2USPS) to get the latest status.
Standard Message and Data rates may
apply. You may also visit www.usps.com
USPS Tracking or call 1-800-222-1811.



# EXHIBIT C



LAW OFFICES
*of*
**BENJAMIN J. CHEEKS**
CRIMINAL DEFENSE & CIVIL LITIGATION

600 West Broadway Suite 700 San Diego, CA 92101  |  T: 619-995-7828  |  F: 619-272-7001  |  bjc@bencheekslaw.com

Warden William True
Florence FCC
5880 State Highway 67 South
Florence, CO 81226

RE: REQUEST FOR EMERGENCY PLACEMENT AND CHANGE OF CONFINEMENT TO HOME CONFINEMENT FOR JOHN LEE BISHOP, REGISTER NO.: 65782-298

Dear Warden True:

In light of the memorandum  dated March 26, 2020 issued by US Attorney General William Barr, John Lee Bishop, by and through his attorney, Benjamin J. Cheeks, respectfully requests consideration for immediate change of placement of confinement to home confinement.  Mr. Bishop currently meets all of the requirements outlined in the memorandum and believes that by being at the FPC-Florence, he is at a greater risk of serious illness or death if infected by the COVID-19 virus, than if he were to be placed in home confinement.  In accordance with the Attorney General's memorandum, the information below fully supports Mr. Bishop's eligibility for release due to the virus outbreak.  This information is verifiable via Mr. Bishop's inmate file, the Sentry System, or his case manager.

 In July 2019, Mr. Bishop suffered a fall, which resulted in hospitalization.  While under medical care for that fall, an MRI revealed the presence of a brain tumor on Mr. Bishop's pituitary gland.  A second MRI confirmed the existence of the brain tumor and further identified it as a macroadenoma.  Aside from the symptoms generally associated with a brain tumor, such as severe headaches, loss of short term memory, confusion, dizziness and extreme weight gain, the tumor's location on the pituitary gland is causing other issues, including his suffering several "mini-strokes."

In addition, Mr. Bishop was diagnosed with hypothyroidism in January of 2020, and awaits the results of endocrinology tests that have been postponed indefinitely as a result of Covid-19.  He is housed in the Critical Care unit at the BOP's FCI Florence facility because of his recent diagnoses.  His presence there will soon pose additional dangers of contracting Covid-19 given the prolific and inevitable spread of the virus throughout Bureau of Prisons (BOP) facilities.

The BOP has increased home confinement by over 40% since March and is continuing to aggressively screen all potential inmates for it.  The Attorney General's memorandum includes a non-exhaustive list of discretionary factors the BOP may consider, including: the age and vulnerability of the inmate to COVID-19, the security level of the facility currently holding the inmate, the inmate's score under PATTERN, the inmate's conduct in prison, and the inmate's likelihood of recidivism, among others.
Here, Mr. Bishop qualifies for relief under these new guidelines, as he satisfies every recommended category:

• He is over 50 years of age as he is 57;
• He has extensive underlying health conditions including a brain tumor, a recent history of mini seizures, chronic headaches, arthritis, sleep apnea, hypothyroidism, hypertension, and has a history of contracting pneumonia. As such, he is a chronic care patient of the BOP and currently takes seven (7) medications prescribed by BOP medical personnel;
• He is statistically unlikely to recidivate based on his age and lack of any prior criminal history;
• He has 1 security point, and is housed in a minimum security camp which is considered "OUT CUSTODY";
• He has a solid re-entry plan.  Mr. Bishop would be met at the gate by his wife, Michelle, who would travel with him to Yuma, Arizona, where Mr. Bishop would self-quarantine for the first 14-days immediately following his release;
• He has no prior incident or discipline reports; and,
• He has the lowest possible PATTERN score.

At age 57, Mr. Bishop is statistically unlikely to recidivate. United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, p. 30 ("as age increases recidivism by any measure declined.").

A review of Mr. Bishop's health record shows that he has a brain tumor, sleep apnea, hypothyroidism, is overweight, previously had bilateral knee replacements for which he takes prescribed medications and is in need of an orthopedic surgery to replace his hip. He also has a history of contracting pneumonia (in both 2018 and 2019), and takes prescribed medications for hypertension. Given his tenuous health condition and age, remaining incarcerated during the current global pandemic puts him at even higher risk for severe illness and possible death. Mr. Bishop's health profile and age match those who are commonly identified as being most at risk of contracting and suffering the most severe health consequences—hospitalization or death.

 We all live together in these unprecedented and extraordinary times. These times require quick, decisive and reasonable exercise of discretion. The Attorney General has vested individual case managers, prisons, and the BOP as a whole with the authority to transfer at-risk inmates to home confinement in order to protect the health and safety of those inmates, as well as the rest of the inmates and staff at the facility. We respectfully request the BOP to exercise that discretion and place Mr. Bishop on home confinement.

Sincerely,

Benjamin J. Cheeks, Esq.
Attorney for Mr. Bishop

# EXHIBIT D

MEMORANDUM[1] FOR:    BISHOP, JOHN LEE
                      Reg. No. 65782-298

FROM W. Holzapiel, Acting Warden FCI

Consideration for your release, under the provisions of Title 18, United States Code, Section 3582 (c)(1)(A), and the Bureau of Prisons Program Statement 5050.50, has been given careful review, which included medical and case summary information. Based on the information, your request for a Compassionate Release/Reduction in Sentence (RIS)has been denied.

Currently, you do not meet the criteria for medical circumstances. A review of your recent medical summary reflects you have been diagnosed with Hypertension, Depression and chronic hip pain. Although you have these medical conditions, you are able to independently attend to your activities of daily living. You are not confined to a bed or chair more than 50% of waking hours and you are not completely disabled and can carry on self-care. After careful review of this information, consideration for Compassionate Release/RIS is denied. In compliance with Bureau of Prison's Program statement 5050.50, you may appeal this denial through the Administrative Remedy Program.

Medical staff will continue to monitor your conditions as clinically indicated. I suggest you work with your unit team and your designated medical and mental health team to address your needs, as they may arise.

---

[1] This is a verbatim copy of the denial letter Mr. Bishop received on April 17, 2020. The undersigned has been unable to obtain a carbon copy of this response as of this filing.

# EXHIBIT E



**Office of the Attorney General**
**Washington, D. C. 20530**

March 26, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS

FROM:            THE ATTORNEY GENERAL

SUBJECT:      Prioritization of Home Confinement As Appropriate in Response to
COVID-19 Pandemic

Thank you for your tremendous service to our nation during the present crisis.  The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times.  We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe.  At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities.  I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

## I.      TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH

One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances.  I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic.  Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care.  But for some eligible inmates, home confinement might be more effective in protecting their health.

In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

Memorandum from the Attorney General                                                    Page 2
Subject: Department of Justice COVID-19 Hoarding and Price Gouging Task Force

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement. We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

## II.   PROTECTING THE PUBLIC

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public. That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways. I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public. I thank you for your service to the country and assistance in implementing this Memorandum.

# EXHIBIT F

# Update on COVID-19 and Home Confinement

BOP continuing to aggressively screen potential inmates



Updated 6:40 PM ET, April 05, 2020

**(BOP) -** In response to COVID-19, the Bureau of Prisons (BOP) has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures.

The BOP has increased Home Confinement by over 40% since March and is continuing to aggressively screen all potential inmates for Home Confinement. On April 3, the Attorney General exercised emergency authority under the CARES Act, to further increase Home Confinement.

Given the surge in positive cases at select sites and in response to the Attorney General's directives, the BOP has begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton and similarly-situated facilities to determine which inmates are suitable for home confinement.

**Inmates do not need to apply to be considered for home confinement.** Case management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General. The Department has also increased resources to review and make appropriate determinations as soon as possible.

While all inmates are being reviewed for suitability, any inmate who believes they are eligible may request to be referred to Home Confinement and provide a release plan to their Case Manager. The BOP may contact family members to gather needed information when making decisions concerning Home Confinement placement.

Since the release of Attorney General Barr's original memo to the Bureau of Prisons on March 26, 2020 instructing us to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed an additional 566 inmates on home confinement. There are currently 3,419 inmate on home confinement and 7,199 inmates in Residential Reentry Centers (RRCs). To further assist inmates in pre-release custody, the BOP has waived financial requirement to pay subsistence fees.

We are deeply concerned for the health and welfare of those inmates who are entrusted to our care, and for our staff, their families, and the communities we live and work in. It is our highest priority to continue to do everything we can to mitigate the spread of COVID-19 in our facilities.

The BOP appreciates the dedication and significant work of BOP staff in carrying out their difficult mission in the face of the public emergency. The BOP would also like to thank the Attorney General, the CDC, the Public Health Service, and our state